**T. Patrick HANNON, Plaintiff,**

v.

**Shirley CHATER, Commissioner of the Social Security Administration, Defendant.**

No. C 94–20351 EAI.

United States District Court,
N.D. California,
San Jose Division.

Sept. 12, 1995.

T. Patrick Hannon, Campbell, CA, in Pro. Per.

Lance Burrow, Mitchell, Stock & Burrow, San Jose, CA, for Plaintiff.

William Murphy, Assistant United States Attorney, San Jose, CA, for Defendants.

ORDER AWARDING PLAINTIFF HANNON DECLARATORY AND INJUNCTIVE RELIEF AND ATTORNEY'S FEES

INFANTE, United States Magistrate Judge.

### I. *Introduction and Background*

Plaintiff T. Patrick Hannon, an attorney representing himself with associated co-coun-

sel, was previously granted partial summary judgment on his claim that, while applying to become an administrative law judge ("ALJ") with the Social Security Administration ("SSA"), he was the victim of gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[1] Under the 1991 amendments to Title VII, it is unlawful for an employer to use gender as a motivating factor in a hiring decision, even though other factors may have also motivated the decision, 42 U.S.C. § 2000e-2(m), and in this case an SSA declarant admitted that in 1993 gender was a factor favoring a female candidate, Anita Shapiro, who was selected instead of Hannon and another male applicant to be an ALJ in Los Angeles (the so-called "position 12").

Fashioning an appropriate remedy was an issue expressly left unaddressed in the Court's ruling, but it was observed that the remedy "may be circumscribed depending on the Government's ability to convince the trier-of-fact that [it] would have offered an ALJ position to the female applicant regardless of her gender".[2] The hypothetical question what the SSA would have done had it entirely ignored gender considerations was tried before a jury, which returned the following special verdict on August 18, 1995:

> "Has defendant proved, by a preponderance of the evidence, that the defendant would have made the same employment decision concerning plaintiff even if unlawful motive, namely plaintiff's gender, was not present?   YES."[3]

Thereafter, the parties were directed to brief the question of the appropriate remedy in light of the jury's special verdict, and the matter was argued and submitted on September 6, 1995.

Hannon proposes that the Court issue one of the following mandatory injunctions:

"A.   Compel SSA to complete selection of the ALJ position number 12 as it existed in 1993; selecting from the two remaining ALJ eligibles [including Hannon];

"B.   Place plaintiff T. Patrick Hannon at the top of the next ALJ certificate [of eligibles for hire] with the same geographic preferences as in 1993 until plaintiff shall have been considered at least three times;

"C.   Place plaintiff T. Patrick Hannon at the top of the next ALJ certificate until plaintiff shall have been considered at least three times and that the SSA justify to the Court any failure to select plaintiff;   or

"D.   Grant plaintiff a preference on the next ALJ certificate such that plaintiff shall be considered no less than three times and that SSA justify to the Court any failure to select plaintiff."[4]

Hannon also requests declaratory relief and an award of attorney's fees and costs in the total amount of $29,912.72.

The Government does not oppose Hannon's request for declaratory relief.[5] However, the Government argues that, because the jury found that Hannon would not have been hired in any event, he "is now in the position he would have been absent the discriminatory action".[6] Nonetheless, the Government asserts it is amenable to an injunction precluding gender from operating as a motivating factor in any future ALJ selection process involving Hannon, who remains on an Office of Personnel Management ("OPM") register of potentially-eligible ALJ applicants.[7]

---

1.   887 F.Supp. 1303 (N.D.Cal. May 26, 1995). The partial summary judgment ruling contains a detailed discussion of the factual background.

2.   887 F.Supp. at 1316 n. 53, citing 42 U.S.C. § 2000e-5(g)(2)(B).

3.   Special Verdict, dated August 17, 1995 and filed August 18, 1995.

4.   Hannon's Brief, at (unpaginated) fifth page.

5.   Assistant U.S. Attorney William F. Murphy acknowledged at the September 6 hearing that Hannon is entitled to declaratory relief pursuant to the applicable statute, 42 U.S.C. § 2000e-5(g)(2)(B).

6.   Government's Brief, at p. 4.

7.   Id., at p. 7.

Further, the Government contends that, for several reasons, Hannon is not entitled to attorney's fees or costs (apart from the initial filing fee). First, the Government argues that Hannon is not a requisite "prevailing party". Second, the Government says, even if Hannon is a prevailing party, his victory was a technical one unworthy of a fee award. Third, the Government urges that fees and costs incurred were not "directly attributable only" to a claim of discrimination on the basis of a mixture of legitimate and illegitimate motives. Fourth, the Government insists that, insofar as Hannon represented himself, he is not entitled to fees.

## II. Discussion

"On a claim in which an individual proves a violation under section 2000e–2(m) of this title and a respondent demonstrates the respondent would have taken the same action in the absence of the impermissible motivating factor, the court—(i) may grant declaratory relief, injunctive relief (except as provided in clause ii), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment ..." 42 U.S.C. § 2000e–5(g)(2)(B).

### A. Declaratory Relief

Hannon's request for declaratory relief is specifically authorized by statute, is unopposed and, as such, is granted.

### B. Injunctive Relief

"The district courts may exercise their traditional equitable powers in Title VII actions", *Boone v. Mechanical Specialties,* 609 F.2d 956, 958 (9th Cir.1979), and have "wide discretion in fashioning appropriate Title VII remedies". *Thorne v. City of El Segundo,* 802 F.2d 1131, 1133 (9th Cir.1986). Because the SSA has demonstrated that it "would have taken same action in the absence of the impermissible motivating factor", 42 U.S.C. § 2000e–5(g)(2)(B), this Court cannot order the SSA to hire Hannon, but may order, within its sound discretion, another form of injunctive relief. See, *Hicks v. Dothan City Bd. of Ed.,* 814 F.Supp. 1044, 1048 (M.D.Ala.1993). The exercise of a district court's equitable powers in a mixed motive failure-to-hire case may include tinkering with the defendant employer's prospective hiring processes in an effort to tailor the most appropriate injunction to the particular circumstances of the case. *See id.*[8]

In this case, the Court is unpersuaded by the parties' respective proposals for injunctive relief. Hannon's proposals are overreaching and the Government's proposal is inadequate.

8. *Hicks, supra,* is the only decision this Court was able to find that has considered the question of what equitable relief is appropriate in a mixed motive failure-to-hire case. In *Hicks,* a white female was passed over for a position as a secondary school assistant principal in favor of a black male applicant. The school superintendent admitted that one of the reasons he selected the black male was because the majority of students were black males whom he felt would benefit from a black male role model. 814 F.Supp. at 1047. The plaintiff sued and moved for a preliminary injunction prohibiting the school board from making the black male's appointment permanent. The district court found that the plaintiff had "presented evidence sufficient to show that an illegitimate criterion was a motivating factor in the school board's selection", and made a further preliminary finding that the school board was unlikely to succeed in demonstrating that it would have hired the black male applicant even in the absence of improper motives. *Id.,* at 1048. The court, however, denied the requested form of injunction because it found that the

proposed preliminary remedy was conditioned on the faulty assumption that displacement of the black male in favor of the plaintiff would be the appropriate remedy if the plaintiff ultimately prevailed in the litigation. The court concluded that, even if the plaintiff entirely proved her case, displacement would not be appropriate because "[t]he unfairness to [the black male] by bumping him is not outweighed by the inadequacy of an alternative remedy". *Id.,* at 1052. The court instead fashioned a preliminary injunction prohibiting the school board from filling, except on an interim basis, any secondary school assistant principal positions which would thereafter become available in anticipation of an ultimate injunction mandating that the plaintiff be hired for the next available position. *Id.,* at 1052–53. *Hicks* bears some factual similarities to the instant case, but is obviously sufficiently distinct from a procedural perspective as to be of limited practical precedence. *Hicks* is important, however, insofar as it illustrates the exercise of a district court's broad equitable authority in a mixed motive failure-to-hire case.

### 1. *Hannon's proposals*

There are no grounds for requiring the SSA to "complete the selection process for position 12" in Los Angeles by hiring either Hannon or the other male applicant. First, as a practical matter, although Ms. Shapiro declined the position in 1993, there is no evidence in the record that it still remains unfilled, hence no reason to believe that this proposal even represents an available option. More importantly, unless the SSA were to have at least one legitimate, viable, alternative candidate to choose from, this proposal would effectively require the SSA to hire Hannon for the position, a remedy specifically foreclosed by § 2000e–5(g)(2)(B). Yet, Hannon would have the Court limit the SSA's alternatives to him or the other male applicant from 1993, notwithstanding that there is no evidence that the latter person remains interested in the position.[9]

Likewise, there is no equitable basis for compelling the placement of Hannon's name at the top of the next certificate of eligible ALJ candidates. Although potentially a feasible option,[10] it is not a fair one. Hannon's rating did not place him at the top of the certificate in 1993. Instead he was the 48th highest-rated candidate of 135.[11] Further, there is no suggestion that the rating he obtained then, 88.75, would otherwise place him at the top of any upcoming certificate. Finally, the arbitrary elevation of Hannon to the top of a list of eligibles would be inequitable vis-a-vis the other applicants on the certificate, who are blameless for discrimination perpetrated by the SSA. See,

*Hicks, supra,* 814 F.Supp. at 1051 ("a court should 'bear in mind that a poorly crafted remedy may achieve justice for one by working a substantial injustice on another' ") (citation omitted). These applicants, like Hannon, are entitled to be considered on an objective assessment of their relative merit.

### 2. *Government's proposal*

On the other hand, it is not enough to enjoin the SSA simply from unlawfully discriminating against Hannon in *future* hiring decisions. Hannon, like all ALJ applicants, already enjoys this protection pursuant to congressional legislation. Awarding Hannon a judicial imprimatur of a right he already owns does not restore him to where he was before the unlawful discrimination occurred. "[C]ivil rights statutes advance dignitary as well as economic interests", *Eddy v. Colonial Life Ins. Co.,* 59 F.3d 201, 204 (D.C.Cir.1995), and Hannon suffers from the badges and incidents of unlawful discrimination, chiefly among which is the knowledge that his credentials were not evaluated entirely on objective criteria. Although the jury concluded on the preponderance of the evidence that Hannon would not have been hired even had gender been ignored as a motivating factor in the SSA's hiring decision, the determination was necessarily hypothetical and inherently unsusceptible of certitude because we can never know what might have been had events not taken the course that they did. Gender played an unlawful role in attempting to fill ALJ position 12 in Los Angeles in 1993 and, because the hiring process was thus improperly infected, Hannon suffered the indignity

**9.** The parties quarrel about the import of applicable legislation specifying that "[t]he nominating or appointing authority shall select for appointment to each vacancy from the highest three eligibles for appointment on the certificate furnished ..." 5 U.S.C. § 3318(a); *see also* 5 C.F.R. § 332.404 (accord). Hannon emphasizes the language "shall select" as imposing a requirement that a position be filled, whereas the Government focuses on the phraseology "highest three eligibles" as necessitating three available candidates for any position. This controversy is entirely beside the point. The Court may fashion an appropriate equitable remedy, even if it means dispensing with the ordinary rules. The difficulties with Hannon's initial proposal, as discussed in the text, is not that it might be out of the ordinary, but that it may be impracticable and, insofar as Hannon were the only real candi-

date, that it would amount to a de facto injunction that Hannon necessarily be hired, in contravention of the spirit and the letter of the law. *See,* 42 U.S.C. § 2000e–5(g)(2)(B)(ii).

**10.** OPM's Director of the Office of Administrative Law Judges, John Flannery, testified at the trial that, in a case of proven discrimination, "I could see several scenarios ... [including having the victim's] name appear first on the very next certificate ...". Transcript of Proceedings ("Tr."), August 15, 1995, at 5:5–21; 65:14—66:19. Flannery testified that this remedy had been used in the past for purposes of correcting administrative errors. *Id.,* at 66:12–17.

**11.** 887 F.Supp. at 1307.

of being denied a full and fair chance to compete for the position.

### 3. *appropriate equitable injunction*

■ Hannon is entitled to have the framework of the ALJ selection process restored, as nearly as possible and with due consideration to the interests of the SSA and other applicants, to that which existed in 1993, so that he can have an objective opportunity to compete for an ALJ post based on the legitimate criteria applicable in 1993. He will not be made whole until he is given such an opportunity.

Hannon remains on the OPM's register of eligible applicants for placement on a certificate of eligibles to be hired for ALJ openings within the SSA.[12] Hannon's current rating, however, is 83.4, below the minimum score of 87 generally required to place a candidate on a certificate of eligibles,[13] and several points lower than Hannon's rating of 88.75 in 1993.[14] It is, therefore, appropriate and equitable to compel the SSA to formally request that OPM restore Hannon's 1993 composite rating of 88.75,[15] and to formally request that OPM place Hannon's name on the next certificate of eligible ALJ candidates for hire regardless of whether Hannon's 88.75 rating would otherwise have qualified him for such placement.[16] In addition, SSA shall be required to adjust the certificate, notwithstanding Hannon's score, in such fashion that he will be among the candidates ranked first and actually considered for at least one ALJ position within the geographical area previously designated by Hannon in 1993.[17]

The SSA, in making its hiring decisions with respect to ALJ openings for which Hannon is among the considered candidates, must comply in good faith with all applicable laws and regulations, including but not limited to the duty not to consider gender as a motivating factor, 42 U.S.C. § 2000e–2(m), and must not retaliate against Hannon, nor adversely affect his candidacy for an ALJ position, nor make any negative notation on a register, certificate, application papers or related documents because Hannon initiated

12. Tr., August 15, 1995, at 22:19—23:10 (Flannery testimony).

13. *Id.*, at 67:17–22.

14. Subsequent to the 1993 certificate, the OPM adjusted the weight given to various components of the composite rating. Greater emphasis was placed on how applicants performed on an examination and in a panel interview and less on their actual experience and personal references. *Id.*, at 43:22—44:12.

15. *See id.*, at 67:2–9 (Flannery testimony) ("Q. Is there any way, given the situation existing in this case, that the agency, the OPM, would consider reinstituting or reinstating [Hannon's] prior score for consideration on the next—on the register that is presently in effect as a remedy for having been discriminated against in some fashion? A. I don't know of it having been done before, but there's always a first time ..."). The Court cannot directly order OPM to take any action since the Court lacks personal jurisdiction over such federal agency. The director of the OPM was previously granted judgment on the pleadings with leave to amend for Hannon's failure to exhaust administrative remedies, Order, filed November 14, 1994, and Hannon never amended his complaint. Moreover, Hannon has not sought to join the director of OPM as an indispensable party on the grounds that complete relief cannot be accorded in his absence. *See* Fed.R.Civ.P. 19(a). Thus, the most that can be done is to order the SSA to formally request action on OPM's part.

16. Flannery testified that he has been "told" that SSA has received budgetary clearance and anticipates hiring a "class" of approximately 30 ALJs in fiscal year 1996. Tr., at 73:18—74:2. The testimony is, of course, hearsay, although with substantial indicia of credibility, and is accepted for what it is worth. In any event, the Court does not desire to impose requirements on the SSA as to timetables for future certificates. The purpose of the Court's injunction is to ensure that Hannon is considered on the very next certificate, whenever that may be.

17. It appears that the adjustment of the certificate to obtain three applicants for every available position is performed by SSA, not OPM. *Id.*, at 24:18—25:20 (Flannery testimony) ("... the agency has the prerogative, if you will, to prepare what they do is a listing of different locations ... and then the three best qualified, that is, the three with the highest scores, if you will, for each of the locations ..."). Flannery's reference to "the agency" is ambiguous, but the context suggests that he meant SSA, not OPM. However, to the extent SSA is incapable of complying with the Court's injunction because it would necessitate interfering with an OPM function, the SSA is bound by the Court's injunction to formally request that OPM take the appropriate action.

and/or prosecuted the instant litigation.[18] This Court shall retain continuing jurisdiction to effectuate and enforce the injunction.

## C. *Attorney's Fees and Costs*

### 1. *prevailing party analysis*

■ In a Title VII action, the court, in its discretion, may award the "prevailing party" reasonable attorney's fees and costs, including expert fees, and the United States is liable for costs the same as a private person. 42 U.S.C. § 2000e–5(k). The standard for making the threshold determination whether a plaintiff is a "prevailing party" is whether he " 'succeeded on any significant issue in the litigation which achieves some of the benefit [he] sought in bringing suit' ". *Hensley v. Eckerhart*, 461 U.S. 424, 432–34, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (citation omitted).[19] "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Texas State Teachers Ass'n v. Garland Ind. School Dist.*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, ——, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992).

"[A] technical victory may be so insignificant ... as to be insufficient to support prevailing party status." *Garland, supra,* 489 U.S. at 792, 109 S.Ct. at 1493 (finding purely hypothetical victory where no evidence that unconstitutionally vague regula-

tion was ever enforced). However, "[o]nce civil rights litigation materially alters the legal relationship between the parties, 'the degree of the plaintiff's overall success goes to the reasonableness' of a fee award". *Farrar, supra,* 506 U.S. at ——, 113 S.Ct. at 574 (citation omitted). "[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.... The result is what matters." *Hensley, supra,* 461 U.S. at 435, 103 S.Ct. at 1940.

> "If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained."

> \*    \*    \*    \*    \*    \*

> "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has the discretion in making this equitable judgment."

> \*    \*    \*    \*    \*    \*

> "... It remains important, however, for the district court to provide a concise but

---

**18.** Any retaliatory or adverse action against Hannon because he vindicated his legal rights would not only constitute contempt of this Court's injunction but in addition could amount to an independent Title VII violation. *See* 42 U.S.C. § 2000e–3(a); e.g., *Moche v. City University of New York*, 781 F.Supp. 160, 168 (E.D.N.Y.1992) ("Employer retaliation for an employee's charge or lawsuit filed under Title VII is itself a violation of Title VII."), *aff'd,* 999 F.2d 538 (2d Cir.1993).

**19.** Although *Hensley* involved the interpretation of a different civil rights statute, 42 U.S.C. § 1988, the Supreme Court observed in a footnote in *Hensley* that "[t]he standards set forth in this opinion are generally applicable in all cases

in which Congress has authorized an award of fees to a 'prevailing party' ". 461 U.S. at 433 n. 7, 103 S.Ct. at 1939 n. 7. The Supreme Court further noted that " '(t)he provision for counsel fees in § 1988 was patterned upon the attorney's fees provisions contained in ... Title VII of the Civil Rights Act of 1964, 42 U.S.C. § ... 2000e–5(k) ...' The legislative history of § 1988 indicates that Congress intended that 'the standards for awarding fees to be generally the same as under the fee provisions of the 1964 Civil Rights Act.' S.Rep. No. 94–1011, p. 4 (1976), U.S.Code Cong. & Admin.News 1976, p. 5912." *Id.,* citing *Hanrahan v. Hampton*, 446 U.S. 754, 758 n. 4, 100 S.Ct. 1987, 1989 n. 4, 64 L.Ed.2d 670 (1980) (per curiam).

clear explanation of its reasons for the fee award.... [T]he district court should make clear that it has considered the relationship between the amount of the fee awarded and the results obtained."

*Id.,* 461 U.S. at 437, 103 S.Ct. at 1941.

■ Hannon is a prevailing party. He has succeeded on a significant issue in this action, namely establishing and obtaining a declaratory judgment of liability for being disparately treated on the basis of his gender, and he has materially altered the parties' relationship because the SSA must evaluate his prospective candidacy according to the injunctive relief afforded in this Order.

### 2. *fees directed to § 2000e–2(m) claim*

Hannon is required to demonstrate that his attorney's fees and costs were "directly attributable only to the pursuit of a claim under section 2000e–2(m)", i.e., a claim of disparate treatment on the basis of mixed motives. 42 U.S.C. § 2000e–5(g)(2)(B). The parties have not cited any cases addressing the meaning of the phrase "directly attributable only".[20]

In this Court's considered view, the phrase "directly attributable only" should not be read restrictively. The Government urges that pleadings, discovery notices, or attorney time records must expressly reference the seminal mixed-motive decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or the partially superseding statute, § 2000e–2(m), before counsel can be awarded fees for such work in a successful lawsuit.[21] Judicial endorsement of such a cramped construction would be unreasonable, because, while a plaintiff may have a good faith basis for believing he has been discriminated against, he may not recognize until the litigation has progressed to a substantial degree that the case may involve a mixture of legitimate and illegitimate motives. As the Supreme Court explained in *Price Waterhouse:*

"Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a 'pretext' case or a 'mixed motive' case from the beginning in District Court; indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both. Discovery often will be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision against her. At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives."

490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12. Moreover, where, as here, a plaintiff invokes several interrelated legal theories, it is unfair to require that a plaintiff's attorney make fine distinctions in the pleadings regarding which theory is being advanced or to perfectly distinguish among the claims worked on in preparing billing records.

"Many civil rights cases will present only a single claim. In other cases the plaintiff's claim for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."

*Hensley, supra,* 461 U.S. at 435, 103 S.Ct. at 1940. Congress could not have intended the "directly attributable only" language of § 2000e–5(g)(2)(B) to subvert such reasoning.

---

**20.** This Court's independent research reveals dictum in one district court decision to the effect that the directly attributable language "stresses Congress' sensitivity to the principle of causation and the need to circumscribe the defendant's liability for actions it would have taken anyway". *Sheppard v. Riverview Nursing Centre, Inc.,* 870 F.Supp. 1369, 1375 n. 4 (D.Md.1994). The court speculated that such terms "may" establish "a more restrictive rule" for awarding attorney's

fees in mixed motive cases, without elaborating the contours of such a rule. *Id.* The court did not decide this question, instead finding the phraseology inapt because the only claim "ever at issue" in *Sheppard* was a single mixed motive claim. *Id.,* at 1375.

**21.** *See* Government's Brief, at pp. 3–4.

Certainly, there is no expression of such intention in the legislative history to the enactment.[22] Instead, the legislative history reiterates the familiar precept that federal civil rights legislation must be "broadly construed", and makes explicit that "when the statutory terms in civil rights laws are susceptible of multiple interpretations, courts are to select the construction which most effectively advances the underlying congressional purpose" of these laws, which is "to provide equal opportunity and effective remedies to persons who have been discriminated against". H.Rep. No. 102–40(II) at 34, *reprinted in* 1991 U.S.Code Cong. & Admin.News 694, 728.

Within the above framework, all of Hannon's co-counsel's attorney's fees can be characterized as directly attributable only to his mixed motive claim.[23] Before the Court issued its partial summary judgment order, the mixed motive theory had not become salient. Instead, Hannon was asserting an array of generalized claims, both claims of disparate treatment and disparate impact, upon discrete theories of gender and race bias, and relating to four different ALJ openings in three different cities. Only after the Court had sifted the issues, and the Government introduced a declaration in opposition to Hannon's summary adjudication motion admitting to a mixture of legitimate and illegitimate motives respecting a single ALJ opening in Los Angeles, did it become apparent that this is purely a mixed motive case, as the Court decided in its partial summary judgment order. Once this decision issued, on May 26, 1995, all fees incurred thereafter were necessarily directly attributable only to the single mixed motive claim and the appropriate remedy thereon. The limited fees incurred by Hannon's co-counsel beforehand, almost entirely in defense of Hannon's deposition, were also directly attributable only to a mixed motive theory because they could not be reasonably disentangled from the common core of facts which underlay all of Hannon's contentions.[24] See, *Hensley, supra,* 461 U.S. at 434–35, 103 S.Ct. at 1940. Hannon presumably would have been deposed by the Government, and would have been well advised to retain co-counsel to defend such deposition, see, *Ehrler, supra,* 499 U.S. at 438, 111 S.Ct. at 1438, regardless of his legal theory or theories. Hence, all of Hannon's co-counsel's attorney's fees and costs were, within the meaning of § 2000e–5(g)(2)(B), "directly attributable only" to prosecution of the mixed motive claim.

### 3. amount of fee award

"In determining the amount of fees to be awarded, a district court is to consider the guidelines set forth in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976)." *Probe v. State Teachers' Retirement System,* 780 F.2d 776, 784 (9th Cir.), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).[25] The twelve factors are:

**22.** But see *Sheppard, supra,* 870 F.Supp. at 1375 n. 4, citing H.Rep. No. 102–40(I), at 49, *reprinted in,* 1991 U.S.Code Cong. & Admin.News 549, 587, and H.Rep. 102–40(II), at 19, *reprinted in* 1991 U.S.Code Cong. & Admin.News 649, 712. The *Sheppard* court's citations to the legislative history do not support its speculation that Congress may have intended to overturn settled Supreme Court caselaw on attributing attorney's fees among several claims. The cited pages do not even address the specific issue, instead focusing on the explicit prohibition against *damage awards* in these sorts of cases.

**23.** Hannon concedes that he is only entitled to his co-counsel's attorney's fees. A pro se litigant in a civil rights action who is also a lawyer may not be awarded attorney's fees. *Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991). Although *Ehrler* was a decision construing § 1988, a statute not involved in this case,

this Court deems its reasoning applicable by analogy to Title VII attorney's fees claims. See, *Hensley, supra,* 461 U.S. at 432 n. 7, 103 S.Ct. at 1939 n. 7 (§ 1988 patterned after § 2000e–5(k)).

**24.** The bills date back to March 23, 1995, when co-counsel was retained to defend Hannon's deposition. The fees and costs total less than $2,900 through May 26, 1995, or less than ten percent of the total fees and costs sought to be reimbursed. See Declaration of Lance Burrows ("Burrows Decl."), ¶ 5 and Exhibit thereto (itemization of fees and costs).

**25.** *Kerr* involved an attorney's fees petition pursuant to the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq. The *Probe* decision, adopting the *Kerr* factors, was enunciated in the context of a Title VII action.

"(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to the acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."

*Kerr, supra,* 526 F.2d at 70, citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). "The failure to consider such factors constitutes an abuse of discretion." *Kerr, supra,* 526 F.2d at 70. However, the Supreme Court has cautioned that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Hensley, supra,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9. Thus, "[t]he court need not discuss each of the guidelines, so long as it discusses those most relevant to the particular case." *Quesada v. Thomason,* 850 F.2d 537, 539 (9th Cir.1988).[26]

"[A]t the very least, the district court must set forth the number of hours compensated and the hourly rates applied." *Quesada, supra,* 850 F.2d at 539 (citation omitted). Lance Burrow, Hannon's co-counsel, has attested to the hours reasonably expended by his firm and the hourly rates of the attorneys working on this matter as reflected in a pre-bill current through August 18, 1995.

"Hours that are excessive, redundant, or otherwise unnecessary are to be excluded when calculating a reasonable attorneys' fee." *Probe, supra,* 780 F.2d at 785, citing *Hensley, supra,* 461 U.S. at 432–33, 103 S.Ct. at 1939. However, the Government has not objected to the reasonableness of any of the specific line items in Burrows' pre-bill, and the Court's independent review of the pre-bill suggests that the charges are generally reasonable.

Hannon's attorneys billed him at their customary and usual fixed fees of $150 (or less),[27] which the Court finds reasonable relative to rates charged for comparable work in the local legal community, i.e., the San Francisco Bay Area. See, *Bucci v. Chromalloy American Corp.,* 1989 WL 222441 *4 (N.D.Cal.1989) (Henderson, J.), *aff'd,* 927 F.2d 608 (9th Cir.1991) (table).

The number of hours reasonably spent on the litigation multiplied by a reasonable rate is the "lodestar fee", in this case $29,335.00. "[T]he lodestar fee should be presumed reasonable unless some exceptional circumstance justifies deviation." *Quesada, supra,* 850 F.2d at 539.

In this case, the limited nature of Hannon's victory amounts to an exceptional circumstance. As the Supreme Court has explained, "[t]hat the plaintiff is a 'prevailing party' ... may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved." *Hensley, supra,* 461 U.S. at 436, 103 S.Ct. at 1941.[28] Because the jury concluded that Ms.

---

26. The parties have not specifically focused their attention on the *Kerr* factors. Accordingly, there is simply no evidence or argument from which the Court might evaluate four of the twelve factors, namely the preclusion of other employment, time limitations, professional relationship and awards in similar cases. Hence, these factors have not been considered. Four other factors are unremarkable and, as such, do not upset the overall balance: the action was one of ordinary difficulty, neither desirable nor undesirable relative to the usual federal case, and required the skills of an attorney of usual competence which Hannon's co-counsel amply satisfied.

27. Burrow Decl., ¶ 3. Burrow was assisted by three associates, all of whom billed at $150 per

hour, except for one who billed her customary rate of $125 per hour. *Id.*

28. Indeed, "[i]n some circumstances even a plaintiff who formally 'prevails' ... should receive no attorney's fees at all". *Farrar, supra,* 506 U.S. ——, 113 S.Ct. at 575. However, such circumstances are not applicable in Title VII mixed motive cases where the defense shows that it would have made the same decision regardless of the improper motive. "Congress has specifically allowed in § 2000e–5(g)(2)(B)(i) that, although no damages may be awarded, attorney's fees and costs may be awarded. This statutory language prevails over the general case law set forth in *Farrar* ..." *Hall v. City of Brawley,* 887 F.Supp. 1333, 1346 n. 5 (S.D.Cal.1995).

Shapiro would have been offered position 12 notwithstanding gender considerations, Hannon necessarily fell far short of obtaining all the relief he sought, which included an award of substantial damages and a mandatory injunction requiring the SSA to hire him as an ALJ. In sum, Hannon achieved half a victory, and in exercise of this Court's discretion, he is entitled to half of his incurred fees—i.e., an award of $14,667.50 through August 18, 1995 (the date of the fee bill), plus supplementation for half the reasonable and compensable fees incurred thereafter.[29]

### III. *Order*

Accordingly, IT IS HEREBY ORDERED, DECLARED AND ADJUDGED:

(1) *Declaratory Judgment.* Pursuant to 28 U.S.C. § 2201, the Court DECLARES that in 1993, in selecting a female candidate, Anita Shapiro, instead of plaintiff T. Patrick Hannon for the position of administrative law judge in Los Angeles, namely position 12, and in taking Ms. Shapiro's gender into consideration as a factor in her favor, even though other factors also played a substantial part in the decision and even though Ms. Shapiro would have be chosen notwithstanding consideration of her gender, defendant Shirley Chater, as Commissioner of the Social Security Administration, unlawfully deprived Hannon of his right to be free from discrimination on the basis of gender in the terms and conditions of prospective employment in violation of 42 U.S.C. § 2000e–2(m).

(2) *Injunction.* Defendant Shirley Chater, as Commissioner of the Social Security Administration, and all employees, officials and agents thereof, are ORDERED AND ENJOINED to formally request that the Office of Personnel Management (a) restore plaintiff T. Patrick Hannon's 1993 composite rating of 88.75 on its register of potentially eligible ALJ candidates; and (b) place Hannon's name on the next certificate of eligible candidates for hire as ALJs regardless whether Hannon's 88.75 rating would otherwise have qualified him for such placement.

Defendant Shirley Chater, as Commissioner of the Social Security Administration, and all employees, officials and agents thereof, are FURTHER ORDERED AND ENJOINED to adjust the certificate, notwithstanding Hannon's score, in such fashion that Hannon will be among the candidates ranked first and actually considered for at least one ALJ position within the geographical area previously designated by Hannon in 1993.[30]

The Social Security Administration, in making its hiring decisions with respect to ALJ openings for which Hannon is among the considered candidates, shall comply in good faith with all applicable laws and regulations, including but not limited to the duty not to consider gender as a motivating factor. 42 U.S.C.s 2000e–2(m).

The Social Security Administration shall not retaliate against Hannon, nor adversely affect his candidacy for an ALJ position, nor make any negative notation on a register, certificate, application papers or related documents because Hannon initiated and/or prosecuted the instant litigation.

(3) *Attorney's Fees and Costs.* Defendant Shirley Chater, as Commissioner of the Social Security Administration, is ORDERED to reimburse Hannon for one-half of his co-counsel's attorney's fees and costs incurred through August 18, 1995, in the total amount of $14,956.36. Hannon may submit, within fifteen (15) days of the filing of this Order, a supplemental application for an order awarding one-half of his co-counsel's reasonable and compensable attorney's fees and costs incurred since August 18, 1995.

(4) *Continuing Jurisdiction.* The above injunction shall continue in full force and

---

**29.** The same analysis applies to the costs of suit. Hannon is entitled to reimbursement for fifty percent of his total costs of $577.72—i.e., $288.86.

**30.** If the Social Security Administration is unable to comply with this aspect of the Court's injunction because adjustment of the certificate to obtain three applicants for each opening is performed by the Office of Personnel Management, *see* Footnote 17 hereinabove, the Social Security Administration shall formally request that the Office of Personnel Management adjust the certificate, notwithstanding Hannon's score, in such fashion that he will be among the candidates ranked first and actually considered for at least one ALJ position within the geographic area previously designated by Hannon in 1993.

effect until the Social Security Administration shall have completed its selection of ALJs from the next OPM certificate *and* the action is *thereafter* ordered dismissed. Within thirty (30) days of the completion of the selection of ALJs from the next certificate, defendant Shirley Chater, as Commissioner of the Social Security Administration, shall, upon thirty (30) days written notice to plaintiff T. Patrick Hannon, lodge a proposed order of dismissal with the Court, which shall be entered unless Hannon, upon motion served and filed before entry of the order of dismissal, and after hearing by the court, shows good cause for continuation of the action. During the effective period of this order, this Court shall have continuing jurisdiction so as to effectuate its purposes and terms and so as to provide for its enforcement.

SO ORDERED, DECLARED AND ADJUDGED.